UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MYRIAD GROUP AG,<br><br>Defendant. | Case No: C 10-05604 SBA<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND/OR QUASH SERVICE OF PROCESS, AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S ALTERNATIVE MOTION TO COMPEL ARBITRATION**<br><br>Dkt. 18 |

The instant action arises from a software licensing dispute between Plaintiff Oracle America, Inc. and Defendant Myriad Group AG concerning Java Technology ("Java"), a product originally developed by Sun Microsystems, Inc. ("Sun"). The parties are presently before the Court on Defendant's Motion to Dismiss and/or Quash Service of Process or, in the Alternative, to Compel Arbitration. Dkt. 18. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES Defendant's motion to dismiss and/or quash service of process and GRANTS IN PART and DENIES IN PART its alternative motion to stay and compel arbitration. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I. BACKGROUND

### A. FACTUAL SUMMARY

#### 1. The Java Licensing Program

On February 15, 2010, Oracle USA, Inc. merged with Sun to form Oracle America, Inc. ("Oracle"), the Plaintiff in this action. Compl. ¶ 2, Dkt. 1. Oracle is a Delaware corporation with its principal place of business in Redwood City, California. Id. As a result of the merger, Oracle assumed ownership of Java, which in essence is a computer programming language that can be used across a variety of platforms, including mobile communications devices. Id.

In 1998, Sun created the Java Community Process ("JCP"), a formalized process that allows interested parties to become involved in developing standard technical specifications for the Java platform. Id. ¶ 16. Under the JCP, proposed specifications for Java are presented through Java Specification Requests, which can be submitted by any JCP participant. Id. In order to become a JCP participant, a party must enter into cross-licensing agreements with Sun/Oracle. Def.'s Mot. at 2, Dkt. 18.

Oracle claims that the "central goal" of its licensing program is to achieve and maintain cross-platform compatibility among various Java licensees. Compl. ¶ 19. To that end, Oracle requires that any product claiming to implement Java must first pass a series of Java Application Programming Interface ("API") specifications. Id. ¶ 19. These tests are distributed by Oracle in its Technology Compatibility Kit ("TCK"), which is a suite of tests, tools and documentation to determine whether the third party's software complies with the specification, and therefore, qualifies for implementation. Id. The right of a third party to use the Java logo is dependent upon the product having passed the applicable TCK. Id. ¶ 21.

#### 2. Relationship with Myriad and Myriad's Predecessor

Defendant Myriad Group AG ("Myriad") is a Swiss corporation with its principal place of business in Dubenhordf, Switzerland. Id. ¶ 3. Myriad was formed as a result of a merger between Esmertec AG ("Esmertec") and Purple Labs. Id. Myriad is a mobile

software company that develops and markets applications for use in mobile telephones and similar devices. Id.

On March 20, 2002, Sun and Esmertec entered into a Sun Community Source License ("Source License") to license Sun's technology and trademarks. Sullivan Decl. Ex. A at 1. The Source License, in turn, includes up to five distinct, additional licenses for: "Research Use; TCK; Internal Deployment Use; Commercial Use and Trademark License." Id.; Compl. ¶ 22.

The Commercial Use License (Attachment D to the Source License) permitted Esmertec to use certain of Sun's proprietary technologies in exchange for the reporting and payment of royalties. Id. ¶ 28. The Source License also included a TCK license (Attachment E to the Source License), which became effective upon execution of a separate support agreement known as a Master Services Agreement. Id. ¶ 30. Under the TCK license, Esmertec was authorized to access Sun's testing protocols. These testing protocols were necessary for Esmertec to confirm and certify that its products were compliant with Java. Id. ¶ 64. Sun requires such compliance as a condition to using the Java trademark. Id. Thus, on the same date, Esmertec entered into a Master Support Agreement, as required by the TCK license. Id. ¶ 35.

The parties subsequently entered into additional Source Licenses, Commercial Use Licenses and TCK licenses on June 25, 2003, June 30, 2006, and June 25, 2009. Id. ¶¶ 31, 39, 45, 47. Certain of these agreements expired on December 30, 2010, while the Master Support Agreement expired earlier on June 29, 2010. Id. ¶¶ 33, 37. According to Oracle, upon expiration of the Master Services Agreement, Myriad was no longer licensed to use any of Oracle's TCKs. Id. ¶ 62. Without access to the TCKs, Myriad allegedly cannot certify any Java implementations after June 29, 2010, and correspondingly cannot brand its products with the Java mark to signify that the product is Java-compliant. Id. Despite this, Oracle alleges that Myriad is continuing to use its TCKs and marks without authorization, and is refusing to report and pay royalties allegedly owed under the Commercial Use Licenses. Id. ¶¶ 55-60, 63-66.

### 3. Pre-Lawsuit Settlement Discussions

In the Fall of 2009, the parties began disputing whether Myriad owed royalties to Oracle under the terms of their licensing agreements. Id. ¶ 55. After a significant volume of correspondence was exchanged, the parties agreed to meet on October 27, 2010, at the offices of Oracle's counsel in New York. Sullivan Decl. ¶ 4, Dkt. 18-1. At the conclusion of the meeting, the parties agreed that it would be productive to schedule a second meeting. Shoet Decl. ¶ 4, Dkt. 33. Although Myriad proposed reconvening in Paris, Oracle, for scheduling and logistical reasons, requested that the meeting take place in the United States. Id.

The parties eventually agreed to meet in Washington D.C. on December 10, 2010. Id. The meeting proceeded as scheduled with company representatives and their counsel present. Id. While the meeting was adjourned for lunch at 1:13 p.m. (Eastern time), Oracle filed the instant lawsuit in this Court against Myriad. Id. ¶ 8. The meeting resumed, but Oracle made no mention of having filed a lawsuit against Myriad during the lunch break. Id. ¶ 9. At around 2:00 p.m., a courier arrived and delivered an envelope to Jeffrey Shohet, counsel for Oracle. Id. The settlement discussions continued until about 3:00 p.m., at which time Mr. Shohet announced that Oracle had just sued Myriad and purported to serve Myriad by handing a copy of the Complaint to Malcolm Dawe, Myriad's Chief Products Officer. Id. ¶ 10.

### B. PROCEDURAL HISTORY

The Complaint filed by Oracle on December 10, 2010, alleges four claims for relief, as follows: (1) trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a); (2) copyright infringement, 17 U.S.C. § 101, et seq.; (3) breach of contract; and (4) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200.

Oracle's claims for trademark infringement, copyright infringement and violation of the UCL are predicated upon the same constellation of facts. Compl. ¶¶ 61-66. In particular, Oracle alleges that Myriad's authorization to use its TCKs was dependent upon

the Master Services Agreement, which expired on June 29, 2010. Id. ¶ 61. As discussed above, compliance with Oracle's TCK's is a prerequisite to Myriad's ability to certify its products as being Java-compliant and to use the Java mark. Id. Thus, in its first claim under the Lanham Act, Oracle alleges that Myriad is improperly using the Java trademark on the ground that as of June 29, 2010, Myriad no longer had the ability to use the TCKs, and by extension, to display the Java trademark. Id. ¶ 71. Likewise, in its claim for copyright infringement, Oracle alleges that Myriad has used Oracle's TCKs after June 29, 2010, without permission. Id. ¶ 75. Finally, Oracle alleges that Myriad violated the UCL by continuing to use Oracle's IP and associating itself with Java and Oracle. Id. ¶¶ 87-88.

Oracle's third claim for breach of contract alleges that Myriad breached Sun's Source Licenses and Commercial Use Licenses by failing to pay royalties and report shipments as required by those agreements. Id. ¶¶ 81-83.

Myriad has now filed a motion to dismiss and/or quash service of process, pursuant to Federal Rule of Civil Procedure 12(b)(5), or alternatively, to compel arbitration. Dkt. 18. In its motion to dismiss and/or quash service of summons, Myriad alleges, inter alia, that Oracle attempted to effect service of process through fraudulent means. In its alternative motion, Myriad argues that in the event the Court permits the case to proceed, it should stay the action to allow an arbitrator to determine whether Oracle's claims are subject to the arbitration clause contained in the Source Licenses. To the extent the Court finds that the issue of whether the claims are arbitrable is a matter for the Court to decide, Myriad contends that all claims fall within the purview of the arbitration clause. The motion has been fully briefed and is ripe for adjudication.

## II. DISCUSSION

### A. MOTION TO DISMISS OR QUASH

A party may challenge the pleadings based on "insufficient service of process," pursuant to Rule 12(b)(5). When service of process is challenged, the party on whose behalf service was made, the plaintiff, has the burden to establish its validity. Aetna Business Credit, Inc. v. Universal I & Interior Design, Inc., 635 F.2d 434, 435 (5th Cir.

1981); Schwarzer, Tashima & Wagstaffe, <u>Fed. Civ. P. Before Trial</u> § 9:148 at 9-47 (TRG 2010).  "In ruling on a motion to dismiss under Rule 12(b)(5) for insufficient service, the court may properly weigh and resolve disputed issues of fact."  <u>Boggiano v. Art Kapoor Realty Inc.</u>, No. C 04-3054 PJH, 2005 WL 1575418, at *2 (N.D. Cal. July 1, 2005).

It is settled that if a person is induced by fraud or trickery to come within the jurisdiction of a court for the purpose of procuring service of process, service should be set aside.  <u>See</u> <u>Commercial Mut. Accident Co. v. Davis</u>, 213 U.S. 245, 256 (1909) ("It is undoubtedly true that if a person is induced by artifice or fraud to come within the jurisdiction of the court for the purpose of procuring service of process, such fraudulent abuse of the writ will be set aside upon proper showing."); <u>accord</u> <u>Comerica Bank-Cal. v. Sierra Sales, Inc.</u>, C 94 20229 PVT, 1994 WL 564581, at *2 (N.D. Cal. Sept. 30, 1994) (citing cases) (Trumbull, M.J.).  Though the Ninth Circuit has not yet reached the issue, some district courts "have adopted a bright-line rule prohibiting service of process where a plaintiff has induced a defendant to enter the jurisdiction for talks, unless the plaintiff first warns the defendant before he enters the jurisdiction that he may subject himself to service, or gives the defendant an opportunity to leave the jurisdiction before service is made if settlement talks fail."  <u>May Dept. Stores Co. v. Wilansky</u>, 900 F. Supp. 1154, 1164 (E.D. Mo. 1995) (citing cases).  Other district courts, including this Court, however, have rejected such an approach.  <u>See</u>  <u>SGS-Thomson Microelecs., Inc. v. United Microelecs. Corp.</u>, No. C-92-1098 DLJ, 1993 WL 299230, at *2 (N.D. Cal. July 21, 1993) (finding "fraudulent inducement doctrine" inapplicable and that "mere physical presence in the forum at the time process is served satisfies the Due Process Clause as it does not violate traditional notions of fair play and substantial justice.") (internal quotations and citation omitted) (Jensen, J.); <u>accord</u> <u>Carrier v. Jordaan</u>, 714 F. Supp. 2d 1204, 1209-1210 (S.D. Ga. 2008) (expressly rejecting bright-line test for fraudulent inducement).

Based on the facts and circumstances presented, the Court finds that the fraudulent inducement doctrine is inapplicable to this case.  The doctrine is intended to protect "defendants who are induced to enter a jurisdiction, where they have no prior contacts,

before litigation begins so that service upon them is a complete surprise." See SGS-Thomson Microelecs., 1993 WL 299230, at *2. Thus, where a defendant has other contacts or is present in the forum for other business reasons, the doctrine is inapt. See Creager v. Yoshimoto, No. C 05-1985 JSW, Slip Op. at 11 (N.D. Cal. Nov. 22, 2005) (denying defendant's motion to dismiss where he was present in California for other business reasons at the time of service). Here, Myriad does not dispute that it has contacts in California and Washington D.C., and that prior to being served in this action, several of its officers already were in the United States conducting other business. See Sullivan Decl. ¶ 6, Dkt. 18-1. As such, Myriad is hard pressed to complain that its being served while in Washington D.C. came as a complete surprise.

But even if the fraudulent inducement doctrine were germane, the Court is not persuaded that Oracle induced Myriad to travel to the United States under false pretenses. At Myriad's suggestion, the first meeting between the parties took place in New York on October 27, 2010. Sullivan Decl. ¶ 4; Shoet Decl. ¶ 4. Myriad proposed that the next meeting take place in Paris, but Oracle believed that conducting the meeting there would be impractical due to timing and logistical issues. Shoet Decl. ¶ 4. Consequently, the parties mutually agreed to meet in Washington D.C. Id. ¶ 5; Sullivan Decl. ¶ 4. The mere fact that Myriad's preference was that the second meeting take place in Paris does not suggest, let alone establish, that Oracle lured Myriad to the United States for the purpose of effecting service of process—particularly where, as here, there is evidence that Myriad was in the United States for reasons unrelated to the instant dispute. The Court therefore denies Myriad's motion to dismiss or quash summons.

### B. MOTION TO COMPEL ARBITRATION AND STAY ACTION

#### 1. Legal Standard

Under the Federal Arbitration Act ("FAA"), any party bound by an arbitration agreement that falls within the scope of the FAA may bring a petition in federal district court to compel arbitration. 9 U.S.C. § 4. When faced with a petition to compel arbitration, the district court's role is a discrete and narrow one. "By its terms, the [FAA]

'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985)).

"The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. . . . If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." Id. "To require arbitration, [plaintiff]'s factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 721 (9th Cir. 1999). Where a district court determines that a dispute is subject to arbitration under a written agreement, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. Thus, the FAA "requires that the court stay judicial proceedings until the matter has been arbitrated according to the terms of the arbitration agreement." Leicht v. Bateman Eichler, Hill Richards, Inc., 848 F.2d 130, 133 (9th Cir. 1988).

### 2. Determination of Arbitrability

The threshold issue presented is whether the Court or the arbitrator determines arbitrability; that is, *who* decides whether Oracle's claims are subject to arbitration. Myriad contends that the arbitrator decides the matter of arbitrability, while Oracle contends the opposite. It is well established that "[t]he question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination [u]nless the parties *clearly and unmistakably* provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (emphasis added); First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) ("If … the parties did not agree to

submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration").

The arbitration clause in the Source License does not expressly provide that the arbitrator is to decide whether a claim is arbitrable. Nonetheless, Myriad contends that the arbitration clause provides that the arbitration shall be "in accordance with the rules of the United Nations Commission on International Trade Law (UNCITRAL)," Sullivan Decl. Ex. A § 8.6, and that Article 23 of the present version of UNCITRAL rules specifies that "[t]he arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement." UNCITRAL Arb. R. Art. 23(1) (2010). Myriad asserts that by incorporating UNICITRAL rules, the Source License must be interpreted as vesting decisions regarding arbitrability with the arbitrator. Def.'s Mot. at 13. The Court disagrees. The UNCITRAL provision cited by Myriad merely provides that the arbitrator has the authority to decide his or her own jurisdiction; it does not state that he must or has the sole discretion to do so. Thus, the fact that the License incorporates the UNCITRAL rules of arbitration does not "clearly and unmistakably" establish the parties' intent to vest the arbitrator with exclusive authority to determine whether particular claims are subject to arbitration. See Howsam, 537 U.S. at 83. Thus, in the absence of such intent, the authority to decide arbitrability remains with the Court. Id.

### 3. Scope of the Arbitration Clause

The Court now turns to the issue of whether some or all of Oracle claims are subject to arbitration. The arbitration clause set forth in the Source License provides that "[a]ny dispute *arising out of* or *relating to* this License" is subject to arbitration. Sullivan Decl. Ex. A § 8.6. The use of "arising out of" and "relating to" establishes that the arbitration clause is broadly construed. Cape Flattery Ltd. v. Titan Maritime, LLC, -- F.3d --, 2011 WL 3076859, at *7 (9th Cir. July 26, 2011) ("when parties intend to include a broad arbitration provision, they provide for arbitration 'arising out of or relating to' the

agreement."). The Ninth Circuit has explained that such language "reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." Simula, 175 F.3d at 721. Thus, "[t]o require arbitration, [plaintiff]'s factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." Id.

Oracle concedes that its breach of contract claim is subject to the arbitration clause set forth in its Source License, but nonetheless argues that its remaining claims for trademark and copyright infringement and violation of the UCL are not. Pl.'s Opp'n at 15. In particular, Oracle contends that its non-contract claims (i.e., all claims other than its claim for unpaid royalties) fall outside the scope of the arbitration clause on the ground that such claims arise from the fact that Myriad allowed the *Master Service Agreement* to lapse, as opposed to Myriad's breach of the *Source License*. This argument is without merit. Under Simula—which Oracle tellingly fails to discuss in its opposition—Oracle's arbitration clause must be construed as encompassing any matter that *touches* the contractual relationship between the parties. Here, each of Oracle's non-contract claims is dependent upon the argument that Myriad had no right to use Oracle's TCK's due to the expiration of the Master Services Agreement. Myriad entered into the Master Services Agreement as a condition of TCK licenses, which specified that use of the TCK's would not be deemed effective unless and until Myriad executed a support agreement. The TCK license, in turn, is part of the Source License. As such, Oracle cannot legitimately assert that its claims—which are predicated on the TCK license—do not "touch" upon the Source License.

Alternatively, Oracle contends that its intellectual property claims are expressly excluded from the scope of the arbitration clause. Section 8.6(a) of the Source License states, in pertinent part, that:

> Any dispute arising out of or relating to this License shall be finally settled by arbitration as set out herein, *except that either party may bring any action, in a court of competent jurisdiction (which jurisdiction shall be exclusive), with respect to any*

> *dispute relating to such party's Intellectual Property Rights or with respect to Your compliance with the TCK license.*

Sullivan Decl. Ex. A § 8.6(a) (emphasis added). The Source License defines "Intellectual Property Rights" as "[w]orldwide statutory and common law rights associated solely with (i) patents and patent applications; (ii) *works of authorship including copyrights*, copyright applications, copyright registrations and 'moral rights'; (iii) the protection of trade and industrial secrets and confidential information; and (iv) divisions, continuations, acquired in the future." Id. at 8 (emphasis added).

Oracle contends that its non-contract claims fall within the carve-out contained in § 8.6 of the Source Agreement because they involve Oracle's trademarks and copyrights, and by extension, Oracle's Intellectual Property Rights. Pl.'s Opp'n at 17-19.[1] Myriad does not dispute Oracle's contentions directly, but instead argues that "the [Source License] is an IP license, and so if the IP carve-out is read loosely it will mean that every claim implicated by the arbitration provision will also fall within the exception excusing arbitration." Def.'s Reply at 10. However, Myriad is incorrect in its assertion that the Source License *only* addresses intellectual property rights. The "Recitals" set forth in the Source License state that the agreement governs both the licensing of technology, as well as Sun's trademarks. Sullivan Decl. Ex. A at 1. Moreover, the Source License incorporates several additional licenses, including the Commercial Use License, which imposes a contractual obligation upon the licensee to pay royalties. Compl. ¶ 28. Indeed, Oracle readily acknowledges, as it must, that its claim for royalty payments is not subject to the IP carve-out.

Even if Oracle's non-contract claims were not excluded under the exception for claims relating to Intellectual Property Rights, they clearly fall within the exception for "any dispute relating to such party's . . . compliance with the TCK license." Sullivan Decl.

---

[1] Although the definition of "Intellectual Property Rights" does not expressly mention trademark rights, Oracle contends, and Myriad does not dispute, that such rights fall within the definition of "a work of authorship[.]" Sullivan Decl. Ex. A at 8; Pl.'s Opp'n at 18 n.7.

Ex. A § 8.6(a). The TCK license expressly states that the license becomes effective only upon the execution of a separate support agreement. Compl. ¶ 30. Oracle's non-contract claims are based on the theory that Myriad lost the right to use the TCKs and the Java marks once the Master Services Agreement expired. Myriad admits as much, but insists that the support agreement simply is a "condition precedent" to the TCK licenses, and therefore, Oracle's claims "cannot accurately be characterized as an assertion that Myriad has failed to comply with the TCK license." Def.'s Reply at 10. However, in order for the carve-out to apply, the claim need only "*relat[e] to*" the licensee's compliance with the TCK license—which Oracle's claims clearly do.

In sum, the Court finds that the carve-out in the Source Agreement is unambiguous and shields Oracle's non-contract claims from arbitration. Accordingly, the Court grants Myriad's motion to compel arbitration with respect to Oracle's claim for breach of contract, and denies the motion as to Oracle's remaining claims.

## III. CONCLUSION

Given the early stage of the litigation, the Court finds that the parties should resume their settlement negotiations in an effort to resolve their dispute before incurring additional, and potentially unnecessary litigation costs. Therefore, the Court will refer the action to the Magistrate Judge or her designee for an early, mandatory settlement conference to take place within the next forty-five (45) days. The action shall be held in abeyance pending conclusion of the settlement conference. In the event the action does not settle, the parties should immediately initiate the arbitration process and proceed with the litigation as to Oracle's non-contract claims.

For the reasons stated above,

1. Defendant's motion to dismiss and/or quash summons is DENIED.

2. Defendant's motion to compel arbitration is GRANTED with respect to Oracle's claim for breach of contract and DENIED with respect to all other claims.

3. The matter is REFERRED to the Chief Magistrate Judge or her designee for a mandatory settlement conference to take place within forty-five (45) days of the date this

order is filed. The action shall be held in abeyance pending the conclusion of the settlement conference. If the action does not settle, the parties shall (a) immediately commence arbitration proceedings with respect to Oracle's contract claim, the litigation of which is stayed pending completion of the arbitration and (b) proceed with the litigation of Oracle's remaining claims.

4. The telephonic Case Management Conference currently scheduled for September 7, 2011 is CONTINUED to **November 2, 2011 at 3:15 p.m.** Prior to the date scheduled for the conference, the parties shall meet and confer and prepare a **joint** Case Management Conference Statement. Plaintiff is responsible for filing joint statement no less than seven (7) days prior to the conference date. The joint statement shall comply with the Standing Order for All Judges of the Northern District of California and the Standing Orders of this Court. Plaintiff is responsible for setting up the conference call, and on the specified date and time, shall call (510) 637-3559 with all parties on the line.

5. This Order terminates Docket 18.

IT IS SO ORDERED.

Dated: September 1, 2011

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

- 13 -